* * * * * * * * * * *
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Donovan and the briefs and arguments before the Full Commission. The appealing parties have shown good grounds to reconsider the evidence, and upon reconsideration, the Full Commission affirms in part and modifies in part the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as: *Page 2 
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction of the parties and of the subject matter.
2. All parties are subject to and bound by the North Carolina Workers' Compensation Act.
3. All parties have been properly designated and there is no question as to misjoinder or nonjoinder of parties.
4. An employment relationship existed between the parties for all relevant time periods.
5. Plaintiff sustained a compensable injury on June 2, 2002 when he and a co-worker were attempting to roll a 350 pound billet using pry bars when the co-worker's pry bar slipped and the entire weight of the billet shifted onto plaintiff's pry bar, resulting in the immediate onset of pain in the right shoulder.
6. At all times relevant to this action, defendant-employer was self-insured for the purposes of meeting the requirements of the Workers' Compensation Act of the State of North Carolina, with Specialty Risk Services as its servicing agent.
7. At the time of his injury, plaintiff's average weekly wage was $878.85, resulting in a weekly compensation rate of $585.90.
8. Plaintiff was employed by defendant-employer as a scrap processor on January 27, 1984. At the time of the injury, plaintiff was employed as a raw materials technician. At the time of the Deputy Commissioner's hearing, plaintiff was still considered employed by defendant-employer. *Page 3 
9. Plaintiff was out of work due to the condition at issue in this case and paid temporary total disability benefits from August 22, 2002 through September 3, 2002 and again from October 7, 2002 through November 25, 2002. On or about June 22, 2003, plaintiff was compensated for a 20% permanent partial disability rating to his right upper extremity on an Industrial Commission Form 21.
10. On April 20, 2004, plaintiff again was removed from work for injury to his right shoulder and has received temporary total disability benefits from that date to the present and continuing pursuant to an Industrial Commission Form 62 completed on April 23, 2004.
11. Subsequent to the Deputy Commissioner's hearing, the parties agreed as follows: In lieu of taking the deposition of Kiel Gillam, the parties stipulate and agree that Kiel Gilliam, RN, CCM, scheduled the January 18, 2007 appointment for plaintiff with Dr. Riley. Plaintiff did not attend this appointment because neither he nor his attorneys were informed that it had been scheduled. The appointment was re-scheduled for January 23, 2007, and plaintiff met with Dr. Riley on that date.
12. The issues before the Commission are whether plaintiff continues to be disabled as a result of his compensable injury; whether plaintiff is capable of performing employment proffered by defendant-employer; whether plaintiff's current right shoulder condition and depression are causally related to his compensable injury by accident; whether Dr. Sally Duffy should be authorized as plaintiff's treating physician over Dr. John Riley; whether defendant is subject to sanctions for failure to adhere to the Workers' Compensation Rules or the Rules for Utilization of Rehabilitation Professionals; and whether plaintiff is entitled to attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1.
 * * * * * * * * * * * *Page 4 EXHIBITS
1. At the hearing before the Deputy Commissioner, the parties stipulated the following documentary evidence:
 a. Stipulated Exhibit #1: Medical records
 b. Stipulated Exhibit #2: I.C. Forms
 c. Stipulated Exhibit #3: photographs
2. In addition to Stipulated Exhibit(s), the following Exhibits were admitted into evidence at the Deputy Commissioner's hearing:
 a. Defendant's Exhibit #1: Job description for security guard
 b. Defendant's Exhibit #2: Job description for janitor
 c. Defendant's Exhibit #3: Three surveillance DVDs
 d. Defendant's Exhibit #4: Two additional surveillance DVDs submitted by defendant, which were not included in those submitted at the Deputy Commissioner's hearing. Over plaintiff's noted objection, these DVDs were admitted into evidence.
 * * * * * * * * * * * RULINGS ON MOTIONS
On October 16, 2007, plaintiff filed a Motion to Amend the Record, asking that records from Dr. Duffy that pre-dated the Deputy Commissioner's hearing be entered into evidence. Plaintiff's motion is hereby GRANTED.
On September 11, 2007, plaintiff filed a Motion to Reopen the Record and a Motion to Suspend Vocational Rehabilitation and Medical Treatment with Kern Carlton, M.D. On October 5, 2007, defendant filed a Motion to Compel Plaintiff to Comply with Defendant's Medical *Page 5 
Treatment. Plaintiff filed an objection. On December 14, 2007, plaintiff filed a Motion for an Order Directing Defendant to Pay for Medical Treatment. The Full Commission held the above motions in abeyance and they are now ruled on in accordance with the following Opinion and Award.
 * * * * * * * * * * *
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the Deputy Commissioner's hearing, plaintiff was 53 years old and completed the eighth grade. Plaintiff was hired by defendant-employer on January 27, 1984 as a scrap processor. Since then, plaintiff was promoted to in-process inspector, analyzer inspector, and raw material processor.
2. Plaintiff suffered a compensable injury by accident on June 2, 2002 when he and a co-worker were attempting to roll a 350 pound billet using pry bars. The co-worker's pry bar slipped and the entire weight of the billet shifted onto plaintiff's pry bar, which struck and caused injury to plaintiff's right sholder. The claim was accepted as compensable and medical and indemnity benefits were provided to plaintiff by defendant.
3. Plaintiff initially received conservative care for his injury by Dr. Jeffrey Daily at the Miller Orthopedic Clinic. In August 2002, his medical care was transferred to Dr. Roy Majors, an orthopedist with Charlotte Orthopaedic Specialists. Plaintiff was diagnosed with a rotator cuff strain with ongoing tendonitis in the right shoulder and on August 22, 2002, Dr. Majors performed an arthroscopic decompression of the right shoulder and repair of the rotator cuff tear. Because plaintiff was still experiencing swelling in the shoulder, on October 17, 2002, *Page 6 
Dr. Majors performed an arthroscopic debridement and revision of plaintiff's shoulder to clean up any possible infection or reaction to the sutures.
4. On November 25, 2002, Dr. Majors released plaintiff to return to modified work. Plaintiff returned to work, and by December 9, 2002, he began to complain of stiffness in his right wrist. Dr. Majors' diagnosis was status post revision rotator cuff repair right shoulder and tendonitis in the right hand. Dr. Majors continued plaintiff's modified work restrictions, therapy and medication.
5. On January 20, 2003, Dr. Majors noted that plaintiff still had "soreness and weakness" and his pain was "dull aching in nature and his shoulder does radiate up into his neck." During this visit, plaintiff complained of pain "in and about his thumb," a complaint he also raised following his second surgery. An examination of plaintiff's thumb revealed some diffuse tenderness at the metacarpal joint, so Dr. Majors administered an injection and referred plaintiff to a hand center specialist for evaluation and possible treatment of his thumb.
6. On February 4, 2003, plaintiff presented to Dr. Paul Perlik, on referral from Dr. Majors. Plaintiff's chief complaint was noted as "right thumb tingling," and continuing shoulder problems. Dr. Perlik noted that "recently he has been complaining of stinging and tingling in his thumb, which comes from the shoulder and supraclavicular region." Dr. Perlik diagnosed right thumb pain and numbness with suspected C6 radiculopathy. He ordered a cervical evaluation because he found no pathology and the symptoms were only in the neck area.
7. On March 3, 2003, plaintiff returned to Dr. Majors with continued complaints of shoulder pain. Dr. Majors opined that he "would not expect the incapacitation that [plaintiff] currently feels is present." Plaintiff declined further treatment by Dr. Majors, who thereafter *Page 7 
released plaintiff from his care with a 20% permanent partial disability rating to his right upper extremity.
8. On March 3, 2004, plaintiff returned to Dr. Majors with complaints of increased pain since December 2003. Dr. Majors noted "quite a bit of crepitation" and decreased range of motion in the neck with some paracervical pain. Plaintiff's right shoulder had full motion, but crepitation with range of motion, and Dr. Majors opined that plaintiff suffered from a recurrent tendonitis status and paracervical pain. Dr. Majors ordered an MRI arthrogram, which showed a full thickness rotator cuff tear.
9. Dr. Majors restricted plaintiff from doing any type of work with his right arm above waist level and no lifting anything over five pounds for any length of time. Defendant-employer could not accommodate these restrictions, so plaintiff went out of work as of April 20, 2004. The parties executed a Form 62 Reinstatement or Modification of Compensation on April 23, 2004. Plaintiff has not returned to work since, but he remained employed by defendant-employer as of the date of the hearing before the Deputy Commissioner.
10. On April 27, 2004, plaintiff underwent a third rotator cuff revision of the right shoulder. Although Dr. Majors released plaintiff to one-handed work at this time, there was no work available for plaintiff with defendant-employer within those restrictions.
11. On September 21, 2004, plaintiff presented to Dr. David Kingery at Miller Orthopedic Clinic for an independent medical examination (IME) at defendant's request. Dr. Kingery noted that plaintiff suffered from "persistent right shoulder pain following multiple failed rotator cuff repairs five months out from most recent repair." He recommended pain management and issued work restrictions that limited plaintiff to ten pounds of lifting with the right arm, no overhead use of the right arm, and only 20 pounds of pushing with the right arm. *Page 8 
12. Plaintiff continued to treat with Dr. Majors for pain through October 6, 2004, when Dr. Majors again released plaintiff from his care with the same 20% permanent partial disability rating. Dr. Majors opined that plaintiff had reached "maximum medical improvement from an orthopedic standpoint" and instructed plaintiff to cease physical therapy and return to work. Dr. Majors recommended permanent restrictions, as well as vocational rehabilitation or permanent job reassignment.
13. Plaintiff returned to Dr. Kingery on December 21, 2004. Dr. Kingery reviewed a December 3, 2004 MRI, which revealed a recurrent full thickness tear of the right rotator cuff. On April 21, 2005, Dr. Kingery performed surgery to repair the torn rotator cuff. According to Dr. Kingery, the prior repair failed because the sutures used to repair the rotator cuff had cut through the tendon. As a result, he used a belt and suspenders technique to repair the tendon, to try to secure the tendon in the best manner possible.
14. Dr. Kingery continued to treat plaintiff through October 2005, and although he released plaintiff to work with restrictions of no lifting over two pounds and no overhead use of the right arm, defendant had no work available for plaintiff within these restrictions.
15. Dr. Kingery last saw plaintiff on October 25, 2005, at which time an arthrogram showed a recent rotator cuff tear. Plaintiff's range of motion of his shoulder was very limited. He exhibited no strength on testing and was unable to raise or rotate the shoulder. Dr. Kingery recommended another surgery; however, plaintiff declined. Dr. Kingery released plaintiff from his care at maximum medical improvement, with restrictions of no overhead use of the arm and a five to ten pound limitation on lifting and pushing.
16. On October 27, 2004, plaintiff came under the care of Dr. Zachariah Gerger. Dr. Gerger is a doctor of osteopathy who is board certified in anesthesiology and pain management. *Page 9 
Plaintiff's chief complaint was chronic shoulder pain and his history indicated a strong desire to return to work and feelings of despondency over the entire situation. The history also noted that "walking, standing, lifting and writing" appear to worsen plaintiff's condition. Dr. Gerger also saw plaintiff on November 15 and December 7, 2004, for complaints of shoulder pain, before referring plaintiff to Dr. Connor for further evaluation of his shoulder. Plaintiff returned to Dr. Kingery at this time rather than Dr. Connor.
17. Dr. Gerger resumed his care of plaintiff on December 21, 2005, after plaintiff was released by Dr. Kingery. Dr. Gerger talked to plaintiff about the management of his condition through medication as well as vocational rehabilitation. Throughout his treatment with Dr. Gerger, plaintiff complained of chronic shoulder pain. Dr. Gerger recommended a cervical epidural steroid injection on July 13, 2006, after which plaintiff noted a 25% improvement in his pain level. On August17, 2006, plaintiff underwent his third injection, reporting a slight improvement in his condition. Dr. Gerger noted that plaintiff continued to suffer from "significant and profound pain in the right upper extremity shoulder area," which he also described as "unremitting."
18. On December 18, 2006, plaintiff was evaluated at the request of defendant by Dr. Kern Carlton, a specialist in physical medicine and rehabilitation. On examination, plaintiff held his right arm in a guarded position and only had an active range of flexion and abduction of 30°. He had subjective diffuse cervical tenderness and weakness throughout his right arm. However, Dr. Carlton found normal reflexes and pulses, no swelling or temperature changes, and equal arm and forearm circumferences. Dr. Carlton could not find a basis for plaintiff's complaint of diminished sensation throughout the arm. Plaintiff did not complain to Dr. Carlton of any *Page 10 
problems in his left arm other than occasional numbness and he did not notice or record any problems with plaintiff's left arm.
19. On January 3, 2007, plaintiff came under the treatment of Dr. Sally Duffy, a psychologist. Dr. Gerger initially recommended the referral to Dr. Duffy, but the treatment was ultimately arranged by plaintiff's counsel. Following her examination of plaintiff, Dr. Duffy corresponded with Dr. Gerger opining that "Mr. Knight is very depressed and anxious with attendant symptoms of anhedonia, irritability, decreased stress and frustration tolerance, amotivation, diminished libido, and social withdrawal." Dr. Duffy further opined that plaintiff was extremely angry, depressed and anxious, and she expressed concern that if plaintiff's "WC benefits are terminated or suspended, he may no longer be able to control his anger and the repercussions could be severe."
20. On January 23, 2007, plaintiff was evaluated by Dr. John Riley, a psychologist who works in the practice with Dr. Carlton. At the examination, plaintiff expressed frustration at not being able to engage in various typical physical activities. Dr. Riley opined that the primary sources of plaintiff's stress were legal issues and his anger over the surveillance video that his relatives made. Dr. Riley did not find any worrisome degree of depression related to plaintiff's lack of physical function, finding only mild depression and that plaintiff's distress and anger were related to his legal issues. Dr. Riley did not believe that plaintiff was in need of any additional psychological treatment or future psychological testing.
21. Amber Sherman, Regional Human Resources Manager for defendant-employer, testified concerning two jobs which were available for plaintiff, security guard and janitor. As explained by Ms. Sherman, the security guard job entailed working in a guardhouse and recording information as visitors entered and left the facility. There was no lifting or carrying *Page 11 
involved and the position required 40-hours per week. The security guard job paid between $13.00 and $14.00 per hour; however, plaintiff would earn $16.66 per hour, which was the same wage he earned in April 2004. Defendant-employer gives a yearly general pay increase of approximately four percent, as well as yearly merit raises; however, plaintiff had reached the highest merit level of "exceptional" at his prior job and would not qualify for merit raises in the security guard job. Plaintiff would continue to receive general wage increases on an annual basis, although they would be half the general increase available to all other employees. Plaintiff would continue to get the reduced general increase until the security guard job's rate of pay caught up with his prior rate of pay, which would take several years. Ms. Sherman also described a janitor job, which was available for plaintiff; however, that job is not at issue in this case.
22. Defendant presented videos taken by one of plaintiff's relatives, which show plaintiff performing various tasks during summer 2006. After reviewing the recordings, the Commission finds that while during many of the activities plaintiff appears to be guarding his right arm and primarily using the left, there are a number of examples of plaintiff using his right arm seemingly without discomfort. These examples include reaching, grabbing, tossing bricks, extending the arm over his head to reach over a fence, raking and sweeping, and reaching behind his head to wipe off his upper back with a rag.
23. Drs. Kingery and Carlton are the only two physicians who agreed to view the surveillance videos. Dr. Kingery noted that plaintiff appeared to favor the right arm and opined that while plaintiff was probably capable of doing more activities than he previously thought at the time of plaintiff's last visit, it did not necessarily mean that plaintiff was able to sustain ten pounds of lifting, pushing or pulling for an eight-hour day. He further opined that the video *Page 12 
footage that he saw was not sufficient for him to entirely restructure all of plaintiff's restrictions. Dr. Kingery noted that plaintiff "definitely still has a torn rotator cuff," and that he would be at risk of developing additional pathologies in his right shoulder if he continued to use his arm to push and pull ten to 25 pounds. Dr. Kingery opined that from a physical standpoint, plaintiff could perform the security guard job offered by defendant, though he felt that the janitor job was outside plaintiff's restrictions because of the buffer use. Dr. Kingery deferred to a psychologist on the issue of plaintiff's psychological ability to perform these jobs.
24. Dr. Carlton opined that plaintiff did not appear to favor the right arm in the surveillance footage, although he admitted that he did not recall which hand plaintiff used to pull the mower or to pull weeds. He further opined that testimony indicating that plaintiff kept the arm down at his side was inconsistent with the surveillance footage and that plaintiff's presentation in the footage was inconsistent with plaintiff's presentation to him and his presentation to Dr. Gerger.
25. Dr. Carlton opined that physically, plaintiff could probably do the security guard job, but that his psychological fitness to do the job should be addressed. Dr. Carlton stated that the janitor job might cause plaintiff more difficulty because it involved the use of the right arm. He did qualify this by saying that the activity in the surveillance footage appeared more rigorous than the janitor job, but the frequency and pace of the activities should be addressed. Dr. Carlton ultimately deferred to Dr. Kingery on whether plaintiff could perform either of the jobs.
26. Dr. Gerger refused to view the surveillance footage, stating that he did not know who had ordered the surveillance or what motives they had. He also felt that reviewing footage from a party who has an interest might sway him or push him in a direction he otherwise would not go. Dr. Gerger opined that it was obvious that plaintiff has a lot of psychological problems *Page 13 
from his long-term chronic pain problem and that the psychiatric problems he identified were causally related to the original injury. He testified that he would defer to a psychologist on the issue of desirability, from a psychological standpoint, of plaintiff's return to a particular employment. Lastly, Dr. Gerger opined that he was familiar with Dr. Riley and did not have a problem with either Dr. Riley or Dr. Duffy treating plaintiff.
27. Dr. Duffy testified that plaintiff is psychologically unstable and that she does not believe that plaintiff is stable enough to return to work for defendant-employer, as his irritability and his volatility would make him a liability. Dr. Duffy also stated that forcing plaintiff to go back to work with defendant-employer would increase his intrusive rumination such that it would likely make his anger and volatility worse. Dr. Duffy further opined that she might have more success getting plaintiff into work with another employer because of all of his anger at defendant-employer. She felt that his condition was worse at the time of her deposition as compared to when she started treating him, to the point that she was concerned that he was homicidal.
28. Dr. Riley performed an IME on plaintiff at defendant's request. Dr. Riley opined that from a psychological standpoint, it would be good for plaintiff to go back to work if the work was within his restrictions and commensurate with his experience and background. However, he admitted that if plaintiff really had strong feelings against returning to work with defendant-employer, it would enhance plaintiff's motivation and allow him to function better to work with someone other than defendant-employer. Dr. Riley agreed with Dr. Carlton that he would like to meet with plaintiff and go over any particular job offer prior to approving him to perform that job. *Page 14 
29. The Commission finds that Dr. Gerger's refusal to view the video footage of plaintiff does not, as defendant argues, "render it inappropriate for him to continue to treat plaintiff and remain involved in the workers' compensation process." Dr. Gerger remains authorized to continue in that regard until the parties are able to agree on a treating physician with the assistance of an Industrial Commission nurse. Additionally, as plaintiff has established a rapport with Dr. Duffy, it would be counter-productive to remove him at this time and assign a different therapist. Accordingly, Dr. Duffy shall remain one of plaintiff's treating physicians.
30. The greater weight of the medical testimony shows that plaintiff has psychological issues related to his injury by accident and that they impact his ability to return to work, especially for defendant-employer.
31. The Commission finds that the security guard job was not suitable for plaintiff due to his psychological condition, and because defendant-employer did not regularly pay $16.66 per hour for the security guard job and typically outsourced these positions. Also, defendant did not present any evidence that plaintiff could obtain a security guard job at that rate of pay with another employer. Dr. Duffy testified and the Commission finds that plaintiff might be more successful returning to work for another employer. However, until Dr. Duffy determines that plaintiff would benefit from participation in vocational rehabilitation, plaintiff shall not be required to participate in vocational rehabilitation provided by defendant.
32. Defendant violated Rule VI(E) of the Rules for Rehabilitation Professionals by failing to file a Form 25N when it assigned Kiel Gilliam as nurse case manager in this claim.
 33. Defendant has not defended this claim unreasonably. *Page 15 
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On June 20, 2002, plaintiff sustained a compensable injury by accident to his right shoulder arising out of and in the course of his employment. N.C. Gen. Stat. § 97-2(6).
2. The parties entered into a Form 21 Agreement, which represents "an admission of liability by the employer for disability compensation pursuant to the Workers' Compensation Act." Kisiah v. W.R. KisiahPlumbing, Inc., 124 N.C. App. 72, 77, 476 S.E.2d 434, 436 (1996),disc. review denied, 345 N.C. 343, 483 S.E.2d 169 (1997). Once the Form 21 is approved by the Commission, a presumption of total disability exists until defendant successfully rebuts the presumption by showing that suitable jobs are available and also that plaintiff is capable of obtaining one, taking into account plaintiff's physical and vocational limitations. Saums v. Raleigh Community Hospital, 346 N.C. 769,487 S.E.2d 746 (1997); Franklin v. Broyhill Furniture Industries,123 N.C. App. 200, 472 S.E.2d 382, cert. denied, 344 N.C. 629, 477 S.E.2d 39
(1996). An employer may not rebut the presumption of disability by offering the injured employee a position with the employer that is not ordinarily available in the competitive job market under normally prevailing market conditions, as such a position would not accurately reflect the injured employee's wage earning capacity. Jenkins v. EascoAluminum Corp., 142 N.C. App. 71, 541 S.E.2d 510 (2001).
3. In this case, defendant offered plaintiff a security guard position; however, the position was not suitable for plaintiff due to his psychological condition. In addition, the position was modified for plaintiff in that defendant did not regularly pay $16.66 per hour for the job and typically outsourced these positions. Additionally, defendant failed to present evidence *Page 16 
that plaintiff could obtain a security guard job at that rate of pay with another employer. Jenkins v. Easco Aluminum Corp., supra. Therefore, the Commission finds that the job was not suitable employment and that plaintiff's refusal to accept this employment was justified. N.C. Gen. Stat. § 97-32.
4. In a claim for additional compensation for medical treatment, the treatment must be "directly related to the original compensable injury."Pittman v. Thomas Howard, 122 N.C. App. 124, 130, 468 S.E.2d 283, 286,disc. review denied, 343 N.C. 513, 471 S.E.2d 18 (1996). It is the burden of the injured worker to prove that the injury or condition being treated is causally related to the compensable injury by accident.Snead v. Mills, Inc., 8 N.C. App. 447, 174 S.E.2d 699 (1970). In this case, the greater weight of the medical evidence establishes that plaintiff's current psychological condition is causally related to his compensable injury. N.C. Gen. Stat. § 97-2.
5. As a result of the compensable injury to his right shoulder, plaintiff is entitled to continuing total disability compensation at the rate of $585.90 per week beginning April 20, 2004 and continuing until further Order of the Commission. N.C. Gen. Stat. § 97-29.
6. Plaintiff shall not be required to participate in vocational rehabilitation efforts provided by defendant until Dr. Duffy authorizes plaintiff to participate.
7. Plaintiff is entitled to payment by defendant of all medical expenses incurred or to be incurred as a result of his compensable injury, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen plaintiff's period of disability, including psychological treatment and medical treatment already provided by Dr. Gerger following the Deputy Commissioner's hearing. Dr. Duffy shall remain designated as one of plaintiff's treating physicians. N.C. Gen. Stat. §§ 97-2(19); 97-25. *Page 17 
8. A Commission nurse shall be assigned to assist the parties in the designation of an authorized treating physician, choosing between Dr. Gerger, Dr. Carlton or another physician agreed upon by the parties.
9. Defendant violated Rule VI(E) of the Rules for Rehabilitation Professionals and therefore is subject to the imposition of sanctions. Workers' Compensation Rules, Rule 802.
10. The defense of this claim was reasonable and not stubborn, unfounded litigiousness and, therefore, plaintiff is not entitled to attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1; Sparks v.Mountain Breeze Restaurant, 55 N.C. App. 663, 286 S.E.2d 575 (1982).
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to a reasonable attorney's fee approved below, defendant shall continue to pay total disability compensation to plaintiff at the rate of $585.90 per week beginning April 20, 2004 and continuing until further Order of the Commission.
2. A reasonable attorney fee of 25% of the compensation due plaintiff under paragraph 1 of this Award is approved for plaintiff's counsel and shall be paid directly to plaintiff's counsel.
3. Defendant shall pay all related medical expenses incurred or to be incurred by plaintiff as the result of his injury by accident, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen plaintiff's period of disability, including psychological treatment and medical treatment already provided *Page 18 
by Dr. Gerger following the Deputy Commissioner's hearing. Dr. Duffy is designated as one of plaintiff's authorized treating physicians.
4. A Commission nurse is HEREBY ASSIGNED to assist the parties in the selection of an authorized treating physician, choosing between Dr. Gerger, Dr. Carlton or another physician agreed upon by the parties.
5. Plaintiff shall not be required to participate in vocational rehabilitation efforts provided by defendant until Dr. Duffy authorizes plaintiff to participate.
6. Defendant shall pay the costs, including a $250.00 sanction to be paid to the Industrial Commission for failure to comply with Rule VI(E) of the Rules for Rehabilitation Professionals.
This 8th day of February, 2008.
S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/______________________ PAMELA T. YOUNG CHAIR
 S/______________________ DANNY LEE McDONALD COMMISSIONER *Page 1